```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK



----------------------------X
                            :
ANN BURTON,                 :
                            :    11-CV-1417 (SLT)(LB)
             Plaintiff,     :
                            :    July 11, 2011
                            :
             V.             :    Brooklyn, New York
                            :
SILVERCREST CENTER FOR      :
NURSING AND REHABILITATION, :
et al.,        Defendant.   :
----------------------------X


       TRANSCRIPT OF CIVIL CAUSE FOR INITIAL CONFERENCE
              BEFORE THE HONORABLE LOIS BLOOM
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          ANN BURTON, PRO SE



For the Defendant:          ALESIA KANTOR, ESQ.



Audio Operator:


Court Transcriber:          ARIA TRANSCRIPTIONS
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (215) 767-7700



Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

```
 1            THE CLERK:  Civil cause for initial conference,

 2   docket number 11-CV-1417, Burton v. Silvercrest Center for

 3   Nursing and Rehabilitation, et al.

 4            Will the parties please state your names for the

 5   record?

 6            MS. BURTON:  My name is Ann Burton.

 7            MS. KANTOR:  Alesia Kantor, Nixon Peabody LLP, 50

 8   Jericho Quadrangle, Suite 300, Jericho, New York, 11753, for

 9   all defendants.

10            THE CLERK:  The Honorable Lois Bloom presiding.

11            THE COURT:  Good afternoon, Ms. Burton, and good

12   afternoon, Ms. Kantor.  I apologize of the technical

13   difficulties.

14            Ms. Burton, at the last conference, I explained to

15   you that all proceedings are digitally recorded and,

16   therefore, you would not need to bring any devices in to get

17   transcripts.  If we ever need them, we can get them from the

18   computer, which means we have to rely on our computers to

19   work and we're all very dependent on our machines.  So I

20   apologize that we were delayed by ten minutes to get the

21   computer up and running.

22            This is a rescheduled initial conference.  As you

23   both know, the first --

24            Somebody has their papers on a mic.  There's a

25   flat mic.  So if it rubs against the mic., there's going to
```

1   be a noise.  Okay.

2          At that failed initial conference where Ms. Kantor

3   appeared by telephone, I directed defendants' counsel to

4   produce plaintiff's personnel file to her as well as the

5   legitimate, non-discriminatory reason that she was

6   terminated from her position.

7          Ms. Kantor, was that done?

8          MS. KANTOR:  We have the documents, your Honor,

9   but Ms. Burton wished to wait until --

10         THE COURT:  I'm going to ask her to give them over

11  to you so that in my presence, they have been produced to

12  you, okay?

13         MS. BURTON:  Yes, your Honor.

14         THE COURT:  Thank you.

15         Now, this is just the start, Ms. Burton.  This is

16  not all the discovery.  Discovery is the process where you

17  try to get information from defendants and defendants will

18  try to get information from you regarding this case.  I

19  asked you at the last conference and you told me you had in

20  fact received the blue manual from the Court.

21         MS. BURTON:  Yes, your Honor.

22         THE COURT:  And the blue manual has a whole

23  section on discovery.  There are five methods of discovery.

24  The rules are set forth in the Federal Rules of Civil

25  Procedure, Ms. Burton.  The Federal Rules are the same rules

1    whether you have counsel or you don't have counsel, and we

2    try in that manual to boil it all down.   There are five

3    methods.   You can use any of the methods, the defendants can

4    use any of the methods.

5          Some of the methods have costs attached, such as

6    conducting a deposition.   You have to get a court reporter

7    to stenographically transcribe the proceedings, unless you

8    agree with defendants' counsel to do it by some other means.

9    A court reporter charges both by the transcript and by the

10   hour, but you can go in the Yellow Pages and try to shop

11   around to get a court reporter.

12         A deposition is a seven-hour question-and-answer

13   session, under oath.   Whereas generally, all the rest of the

14   methods of discovery are done on paper, a deposition is

15   live, and they get to ask you questions for that period of

16   time without you having the questions in advance.   I know

17   for a fact that they're going to notice your deposition, so

18   I'm telling you a little bit ahead of time.

19         Generally, the parties conduct what's called paper

20   discovery, which is requests for documents and

21   interrogatories, which are set forth in Rules 33 and 34.

22   And after you complete paper discovery, you usually move to

23   any other discovery device, such as deposition, but that's

24   not in the rule.   In the rule, it says if you serve a paper

25   discovery request, that the other side gets thirty days from

1    when they receive it to respond to it.  So if they make a

2    request of you in writing, you have thirty days from the

3    date you receive it to respond to it.  If you need more

4    time, you have to contact the other side to request more

5    time.

6             So let's go over a little bit what was stated in

7    your complaint.  You say that you were formerly employed by

8    Silvercrest as a licensed practical nurse and then a

9    registered nurse, that you began your employment in October

10   of 2004 and that by March of 2009, you were working as a per

11   diem R.N.

12            Why don't you tell me in your own words why you

13   decided to bring the case and what it is you're hoping to

14   accomplish, Ms. Burton.

15            MS. BURTON:  I decided to bring the case, your

16   Honor, because I was wrongfully terminated and I was

17   discriminated against.

18            THE COURT:  And I do have that as part of your

19   complaint.  I have read the complaint.  But what is it that

20   you're hoping to accomplish by brining the action, because

21   generally, Ms. Burton, people bring complaints to the

22   federal court because they can't allow what happened to go

23   unchallenged.  But if you don't have an end goal in mind, if

24   you don't know what it is that you're trying to accomplish

25   by bringing the case, then it's very difficult for us to get

1  to that goal.

2  So have you thought about what it is that you're

3  hoping will happen by bringing this case?

4  MS. BURTON:  Yes, I have, your Honor.  As a nurse,

5  when you're terminated from employment for misconduct, your

6  chances of being hired ever again are slim to none, which

7  has happened so far.  Therefore, my reputation has been

8  damaged, my name has been damaged.  I have only been a

9  registered nurse since 2008.  Therefore, my ability to be

10  gainfully employed now and in the future is impossible.

11  It's impossible not only just for a professional

12  position but a non-professional position.  Not even

13  McDonald's, not even Macy's would hire me, because when

14  you're terminated as a nurse for misconduct, you're a

15  liability.  You cannot take back those allegations that have

16  been put out there.

17  THE COURT:  Let me just ask you, Ms. Burton,

18  because I see that there was an entire shift that was cited,

19  is that correct, the 2 North 11:00 p.m. to 7:00 a.m. shift?

20  MS. BURTON:  Yes, your Honor.

21  THE COURT:  How many people were in that shift?

22  MS. BURTON:  It was seven.

23  THE COURT:  And everybody was terminated, you're

24  saying.

25  MS. BURTON:  Yes, your Honor.

1          THE COURT:  So what happened was an elderly

2   patient fell?  Is that my understanding?

3          MS. BURTON:  A patient fell on the evening shift

4   and he fell on the night shift.  No one from the evening

5   shift was terminated and everyone from the night shift was

6   terminated.

7          THE COURT:  Now, I just have to make sure you

8   understand, even though there may be other people that you

9   say were terminated, this is only your case, brought on your

10  own behalf.

11         MS. BURTON:  Yes, your Honor.

12         THE COURT:  You say that the defendants retaliated

13  against you after you filed an EEOC charge in July of 2010.

14  The event that you're talking about where the resident fell

15  was May of 2010.  Was there an investigation done?

16         MS. BURTON:  With the EEOC?

17         THE COURT:  No, the May, 2010 fall.

18         MS. BURTON:  I don't know what Silvercrest did,

19  because when I requested information, they refused to give

20  me information.  So I don't know what they did.

21         THE COURT:  Ms. Kantor, because this is going to

22  be part of the issue, can you tell me in a nutshell what

23  Silvercrest's position on this is and what was done with --

24  if it wasn't Silvercrest's position that the fall was what

25  led to Ms. Burton's termination, now would be a good time to

1  tell me what the legitimate, non-discriminatory reason is,

2  Ms. Kantor.

3          MS. KANTOR:  Your Honor, the fall was one of a

4  number of incidents.  All surrounding the fall were a number

5  of acts or omissions, frankly, that led to the termination.

6  And as is stated in the interrogatory response we provided

7  to plaintiff this afternoon, she was terminated for failing

8  to supervise or assign someone to supervise a patient she

9  had been told had just fallen out of a wheelchair right

10 before her shift.

11         That patient was placed at the nurse's station by

12 the nurse on the evening shift, the shift prior to Ms.

13 Burton's, to await an ambulance, because he had indeed

14 fallen on the prior shift, as Ms. Burton had said and was

15 vomiting.  Of course, a doctor assessed him and it was

16 determined he needed to go to the hospital.

17         So this was right about the change of shifts.  The

18 patient was placed at the nurse's station.  Ms. Burton was

19 apprised by the evening nurse, as the shift was transferring

20 over to Ms. Burton's care, what had occurred and, indeed, he

21 did fall again.  So she terminated for failing to either

22 supervise this patient or assigning someone to supervise

23 him.

24         Once he did fall, she failed to perform what is

25 called a full-body assessment.  That is, the patient should

1   have been brought back to his bed and should have been

2   checked out to see if there were any bruises or other

3   injuries before he went back to the hospital.  That did not

4   happen.  She did not take his vital signs.  That was a

5   problem for us.

6          She filled out what is called an occurrence

7   report, but in the occurrence report, she, Ms. Burton that

8   is, used the vital signs that had been reported on the prior

9   shift for this particular occurrence on that paperwork.  And

10  on the EMR, your Honor, which is an electronic medical

11  record which needs to be kept up to date, Ms. Burton did not

12  note the fall at all, noted the fall on the prior shift but

13  did not note the fall on this shift.

14         So for all of those reasons and also for the

15  failure to provide care to this patient in general -- he had

16  been picked up, plopped back in the chair and was awaiting

17  the ambulance.  The lack of compassion -- and that would be

18  from the entire shift, not just Ms. Burton, because that

19  issue as well --

20         THE COURT:  That leads me to the next question:

21  Were the rest of the shift likewise disciplined?

22         MS. KANTOR:  Everybody was let go.  Ms. Burton was

23  the only registered nurse.  She was in charge.  She was let

24  go.  There was one L.P.N.; that's a licensed practical

25  nurse.  She was let go.  And there were certified nurse's

1    aids who were also let go.  I believe there were four.  I

2    think Ms. Burton mentioned seven.  I thought there were six

3    but in any event, yes, the shift was let go.

4              THE COURT:  Now, Ms. Burton's claim here is that

5    she was discriminated against on the basis of her being

6    black.  I don't know how your color, brown, and national

7    origin, American play in, on the basis that you're over

8    forty, Ms. Burton, and on the basis of a disability, but I'm

9    not quite sure what the disability is.

10             It may have been that you used the forms that the

11   Court gives out as the basis for your complaint and you

12   believed, Ms. Burton, that you needed to check all of the

13   boxes for the various causes of action.  I'm not quite sure.

14   In other words, I understand that you're making a claim

15   based on race, and I understand that you're making a claim

16   based on age, but I don't really understand the national

17   origin, how being American played into you being terminated.

18   I don't really understand how -- what the disability is that

19   you're alleging.

20             MS. BURTON:  The other R.N.'s, their national

21   origin was not American.

22             THE COURT:  The R.N.'s on your same shift or on

23   the different shifts?

24             MS. BURTON:  No, the R.N.'s that were not

25   terminated.

1          THE COURT:  But, again, they're saying that

2    everyone on your shift was terminated.

3          MS. BURTON:  Everyone on my shift was.

4          THE COURT:  Right.

5          MS. BURTON:  But that's the discriminatory fact,

6    that the same lack of supervision occurred -- the alleged

7    lack of supervision occurred on the evening shift and no one

8    was terminated.

9          THE COURT:  So I'm looking, Ms. Kantor, at the

10   complaint that was filed, and it appears on paragraph 5 --

11   it's on page 5, paragraph 6 that Ms. Burton is claiming that

12   defendants discriminated against plaintiff in that the

13   people who were on the other shift, 3:00 p.m. through 11:00

14   p.m., were Haitian and Russian, and that they weren't

15   terminated on that basis.

16          Ms. Burton, I didn't do this the last time because

17   both sides weren't in the courtroom.  In an employment

18   discrimination case, the prerequisites for coming to court

19   are fairly low.  You need to go through the Equal Employment

20   Opportunity Commission, file a charge of discrimination and

21   obtain a right to sue letter, which you did before you came

22   to court.  Then, once you bring your complaint, the

23   defendant responds to the complaint.

24          But it's my duty to tell you that the plaintiff

25   bears the burden of proof in all cases that are brought to

1   court where you are trying to vindicate your rights.  So in

2   an employment discrimination case, you have to show that

3   you're a member of a protected class, that you are otherwise

4   qualified to do the job, that there was an adverse

5   employment action taken against you, and that there's an

6   inference that that adverse employment action was taken

7   against you based on your membership in the protected class.

8            You've done that by filing your complaint.

9   They've now filed an answer to the complaint and basically,

10  defendant need only proffer a legitimate, non-discriminatory

11  reason for why they took the adverse action, which is why I

12  had them answer that interrogatory, so we could be

13  completely clear what they're going to say the reason for

14  your termination was.  Then the burden shifts back to you

15  and you bear the ultimate burden to show that the reason

16  that they gave is not -- that they were motivated at least

17  in part by a discriminatory reason.

18            As far as an age claim, the supreme court has made

19  age claims much more difficult to prove than race or other

20  types of claims.  Age claims, you must prove that your age

21  was the but-for reason for the termination.  Under Title

22  VII, you have to show that the legitimate, non-

23  discriminatory reason is a pretext and that the defendants

24  were motivated at least in part by discrimination.  So you

25  bear the burden of proof on the ultimate issue of

1  discrimination.

2          In employment discrimination cases, the logical

3  starting point, which is why I had them produce to you your

4  personnel records, is what's in your personnel records.  And

5  let me tell you, many employees don't have an idea what's in

6  their personnel records.  So having things in your personnel

7  records doesn't necessarily mean that they violated your

8  rights because they put something there that you didn't know

9  about.  I'm having them turn those over to you as a starting

10  point, so you could review those to figure out what other

11  types of records you need.

12          If you're going to make a request for anybody

13  else's employment records to try to prove that other people

14  who you were similarly situated to were treated

15  differentially because of your protected class, you're going

16  to have to enter into what's called a protective order with

17  the defendants.  You're going to have to mutually agree with

18  the defendants that any documents that are exchanged are

19  kept confidential and will be used solely for the purpose of

20  this litigation.  So they have a duty to their other

21  employees.  If you had a lawyer, your lawyer would enter

22  into this type of agreement.  You don't have a lawyer;

23  they're even more concerned about giving you records from

24  other people.

25          Likewise, if you've made a claim for damages, they

1    may be requesting that you release some of your records

2    regarding any emotional distress claim you may have made or

3    any claim that you're going to make regarding how this

4    termination injured you.  I don't see, Ms. Kantor, that

5    there's an emotional distress claim.

6              MS. KANTOR:  Your Honor, if I may.

7              THE COURT:  Yes.

8              MS. KANTOR:  Page 8, paragraph 20 reads,

9    "Defendants actions affected plaintiff's professional

10   benefits and mental and physical well-being."  I interpret

11   that in the broadest sense as a claim for emotional distress

12   damages.

13             THE COURT:  So then you'd have to make a choice,

14   Ms. Burton.  If you are going to pursue a claim for

15   emotional distress damages, they would be entitled to obtain

16   records of any mental health or physical evaluation or

17   treatment that you've gotten, and you'd have to sign

18   releases for them to get access to your doctors' records and

19   your mental health provider records.

20             MS. BURTON:  That's not a problem.

21             THE COURT:  Okay.  So I'm telling you what you can

22   look forward to in the litigation.  Ms. Kantor is not the

23   person who did any of these things to you but she does

24   represent Silvercrest Center, she does not represent you.

25   And most lawyers are quite uncomfortable speaking to

1   litigants who are unrepresented.  So I will tell you, both

2   of you have the duty to deal with each other.  You both have

3   the duty to treat each other professionally.

4          I would not recommend that you do things by e-

5   mail, I would recommend that you start off as you would with

6   anybody else.  If you can't agree to something by calling

7   each other, then you put it in writing.  But I don't like e-

8   mails between pro se litigants and lawyers because I think

9   that lawyers are used to getting quite a few e-mails a day

10  and that if they don't respond right away, you take that as

11  a sign that they're not paying attention.  I'd rather it be

12  phone calls if you need to and in writing, whatever else

13  needs to be done.

14         You will need to meet with each other, and you're

15  going to have to get a confidentiality order so that if they

16  have to turn over records of other employees, they have your

17  signature saying that you'll keep it confidential.

18  Likewise, if they get access to your medical records and

19  your mental health records, they have signed a document

20  saying that they will keep those things confidential, so

21  it's mutual.

22         Ms. Kantor, I'm quite confident that Nixon Peabody

23  has its own confidentiality forms.  I'm going to ask you to

24  boil those forms down so that it's something that Ms.

25  Burton, who's very intelligent, will understand and know

1   what she's signing.

2          Ms. Burton, don't ever sign anything without

3   keeping a copy of it for your own record.  If she sends you

4   a copy of it and you sign it, keep a copy for yourself.  You

5   could always ask her to forward two copies to you, okay?

6          MS. BURTON:  Yes, your Honor.

7          THE COURT:  And if you have a question about

8   anything that's in a document, your starting point is to try

9   to discuss that with Ms. Kantor, not writing to the Court in

10  the first instance, okay?

11         MS. BURTON:  Yes, your Honor.

12         THE COURT:  Okay.  So, Ms. Burton, I've just given

13  you the basics about discovery.  My job is to move the case

14  forward.  You bring the case to court, my job is to move the

15  case forward.  Generally, that means setting deadlines.  I

16  don't have conferences throughout the case.  I start it with

17  a pretrial conference to set the deadlines and then if

18  there's a breakdown between the parties and they're unable

19  to resolve a dispute regarding discovery, you can then,

20  after diligently trying to work it out between yourselves,

21  you can then write to the Court or request a conference.

22         You could also request a settlement conference.

23  If the parties are talking about how they might be able to

24  resolve the case without going through the whole litigation,

25  I'm more than happy to help you try to reach a resolution

1   here.  That's why I was asking you those questions about

2   what it was that you were hoping to accomplish.  Usually,

3   the defendant is not going to agree to give you full relief.

4           Let me tell you for a moment what full relief is

5   under the statute.  If you prevail in an employment

6   discrimination case, Congress in its wisdom has afforded

7   that you can be reinstated to put you back in the position

8   you would have been had you never been terminated and that

9   you could get back pay from the date that you were

10  terminated until the date that you are reinstated.

11          However, there is something called mitigation of

12  damages, where you're not supposed to just put your feet up

13  and sit back.  You're supposed to make an effort to get re-

14  employed, and the defendants are entitled to ask for records

15  regarding what efforts you've made to try to get re-

16  employed.

17          There's also compensatory damages, which is where

18  your request for emotional distress damages come in.  If you

19  can show that you were injured and that it caused you

20  damages other than the back pay, you can make a claim.

21  Title VII, the statute that prohibits employment

22  discrimination based on race, gender, religion, national

23  origin and color provides for caps, depending upon how many

24  employees there are.  So depending upon how many employees

25  are in -- I don't know if it's just Silvercrest as the

1    defendant or it's a bigger corporation.

2         Ms. Kantor?

3         MS. KANTOR:  My understanding is it's just

4    Silvercrest.

5         THE COURT:  So depending upon how many people they

6    employ, there are caps on the compensatory damage awards

7    provided in the statute.

8         Age discrimination and disability discrimination

9    are separate statutes, Ms. Burton.  They do follow somewhat

10    from Title VII because they were passed after Title VII was

11    passed.  Title VII is a 1964 Civil Rights Act.  It was at a

12    time when no discrimination was unlawful.  People were

13    allowed to publish in newspapers "no blacks need apply, no

14    women need apply, no Jews need apply."  That was legal until

15    this Act was passed.

16         So although many people feel that they've been

17    treated unfairly in the job, I will tell you it's much

18    harder to prove discrimination than it is to prove that

19    something unfair happened on a job.  Do you understand, Ms.

20    Burton?

21         MS. BURTON:  Yes, I do, your Honor.

22         THE COURT:  Okay.  Ms. Burton, as I said, my job

23    is to set deadlines and generally, I give parties in a

24    single person employment discrimination case three to four

25    months to complete discovery.  Is there a reason why that

1   would not be a sufficient amount of time?  That means that I

2   would set discovery to close sometime in October.

3           Again, remember, you need to send any request and

4   give them thirty days to respond.  Except for a notice of

5   deposition, which is generally scheduled with about two

6   weeks' to four weeks' notice, every other type of device in

7   the rules requires thirty days to respond once they receive

8   the request.  Do you believe that it would be a sufficient

9   amount of time to give you both until the end of October?

10          MS. BURTON:  Your Honor, I would need a little bit

11  longer time because I go on vacation from July 12th to August

12  16th.

13          THE COURT:  Good for you.  So if I set it in

14  November, will that work for you, Ms. Burton?

15          MS. BURTON:  I think that would be sufficient,

16  your Honor.

17          THE COURT:  And how about for you, Ms. Kantor?

18          MS. KANTOR:  I'm sorry, your Honor, that would be

19  the end of November?

20          THE COURT:  No, middle of November.

21          MS. KANTOR:  That's fine.

22          THE COURT:  Okay.

23          Now, when I set the deadline, I'm not micro-

24  managing when you send things out but please keep in mind,

25  Ms. Burton, that if I set the deadline as I am for November

1   15th, you must send something out before October 15th in order

2   to get a response.  You can't wait until the deadline to

3   make the requests.

4            Likewise, if they notice you for a deposition, Ms.

5   Burton, and the date that they give you when they send you

6   the notice is inconvenient, you must contact Ms. Kantor

7   immediately.  Don't wait until the day of the deposition or

8   else they will move for sanctions against you, which could

9   cover the costs of hiring a court reporter, okay?

10           MS. BURTON:  Yes.

11           THE COURT:  They will work with you to get a date

12   that's agreeable to you.

13           Okay, so November 15th is the deadline to complete

14   all discovery and then Judge Townes has her individual rules

15   regarding any motion for summary judgment.  Many cases do

16   not make it to trial.  Many cases are dismissed on motions

17   asking for judgment as a matter of law, saying that based on

18   the facts that you've given, even assuming them to be true,

19   that a reasonable jury could not find in your favor under

20   the law.

21           In order to make that kind of motion, judges

22   require permission and a schedule to be set.  So I'm saying

23   within two weeks of the deadline for discovery, you need to

24   write to Judge Townes to make a request.  I'm saying two

25   weeks, knowing that Thanksgiving holiday falls right in

1    between.   So I'm saying that you have to make the request --

2    I'm giving you a couple of days leeway -- by December 5th.

3    That doesn't mean to make the motion, that means to write to

4    Judge Townes to request a pre-motion conference.  And I will

5    tell you that a number of judges, if you set forth the

6    grounds and you set forth a schedule, can obviate the need

7    for the pre-motion conference and instead give permission on

8    the schedule that's proposed.

9            Always build in at least thirty days for a pro se

10   litigant to oppose, and keep in mind, Ms. Kantor, that under

11   Local Rule 56.2, there's a special notice that's required if

12   you're moving for summary judgment against a pro se party.

13   And if you fail to give that notice, the motion must be

14   denied.

15           MS. KANTOR:  Thank you, your Honor.

16           THE COURT:  Okay, Ms. Burton, do you have other

17   questions for me today?  I've set the schedule for November

18   15th.  I'm going to put that into a written order.  Is there

19   any reason to believe that you need to amend your complaint

20   at this point in time?

21           MS. BURTON:  No, your Honor.

22           THE COURT:  No?

23           MS. BURTON:  No.

24           THE COURT:  Well, again, I'll build in a period of

25   thirty days.  If you don't move to amend by that date, then

1  your time to amend has passed, okay?  November 15th to

2  complete all discovery and December 5th if there's going to

3  be any application to the district judge for a pre-motion

4  conference.

5       As far as a confidentiality agreement, I would

6  like you both to work on that in the next two weeks, to get

7  a confidentiality agreement that you both can agree on, you

8  both are going to sign, and then you're going to the Court

9  to enter that, okay?  That will protect both of you.  That

10  way, if they ask you to sign releases for your medical

11  records or your mental health providers, you won't be

12  worried that they're going to use it for any other purpose.

13  Likewise, if they're going to turn over documents regarding

14  any of these other employees that you say worked on the

15  other shift, they won't feel that you're going to use it for

16  any other purpose, okay?

17       MS. BURTON:  I have a question.

18       THE COURT:  Yes.

19       MS. BURTON:  In reference to these documents, is

20  this considered as an interrogatory or this is a request for

21  documents?

22       THE COURT:  What is "this," that they've given

23  you?

24       MS. BURTON:  That they've given me.

25       THE COURT:  I directed them to produce these

1    documents, so they're considered documents because that's

2    what they're coming from.  But you're not -- if your

3    question was that you're limited to 25 interrogatories,

4    that's your own interrogatories.  What I directed her to do

5    does not count toward your quota, okay?

6              MS. BURTON:  Okay.

7              THE COURT:  Anything else, Ms. Burton?  So I'm

8    saying a confidentiality agreement within two weeks.  We're

9    currently at 7/11, so that puts us to 7/25.  Work with Ms.

10   Kantor.  If you don't understand anything in it, have her

11   explain.  You can get the language boiled down so that you

12   both can agree to it.  If there's a problem with that, it's

13   not a good sign, but you can call upon me.  Hopefully, you

14   won't need to.

15             Anything else, Ms. Burton?

16             MS. BURTON:  Yes, your Honor.  In regards to the

17   tape recorder, you did say that I didn't need to bring one

18   but can I bring one?

19             THE COURT:  They're generally not permitted in the

20   courthouse, and that goes for everyone.  And unless there's

21   a trial where there's some media thing that needs to be

22   played that the Court doesn't have a way to play it, you're

23   generally not allowed to bring devices into the courthouse.

24   That's why they take phones, they take PDF's.  You're not

25   allowed to for security reasons.

1          If you need a copy of the transcript, that's

2    something you can request.  Is that what you're requesting,

3    a copy of today's transcript?

4          MS. BURTON:  That's not the issue.  I have had

5    other situations where recordings have gotten lost and what

6    was transcribed was transcribed inaccurately, to say the

7    least.

8          THE COURT:  Well, again, the general rule is no,

9    and I can tell you that it's few and far between where a

10   tape recorder is brought in, and it's generally for a trial

11   or a hearing, okay?

12         MS. BURTON:  Thank you, your Honor.

13         THE COURT:  Anything further, Ms. Kantor?

14         MS. KANTOR:  Yes, your Honor, two things, or three

15   actually:  I do not have the telephone number for Ms.

16   Burton.

17         THE COURT:  Okay.  Can I ask the two of you to

18   deal with that outside?

19         But she will need a way to reach you, Ms. Burton.

20         MS. BURTON:  I don't have a phone.

21         THE COURT:  Well then, how should she reach you if

22   she needs to reach you?

23         MS. BURTON:  Basically, by mail, which there is a

24   problem because my e-mails are hacked, my mail is

25   intercepted and when I had a phone, they were intercepted as

1  well, so you know --

2        THE COURT:  But what are we going to do if we need

3  to call off a date that's been set?  How is the best way to

4  get in touch with you?

5        MS. BURTON:  I would say mail.

6        THE COURT:  And is it a P.O. box or is it a

7  regular address?

8        MS. BURTON:  No, regular address.

9        THE COURT:  So you could Fed Ex if you needed to

10  get her on an overnight basis, okay?  And that has a

11  tracking receipt, so that's usually what I recommend.

12        MS. KANTOR:  Absolutely.  Issue number two, your

13  Honor, is as far as the confidentiality order is concerned,

14  would you like us to submit that to the Court for the

15  Court's --

16        THE COURT:  Before?  No, not before.  Send her

17  your usual.  Try to boil down the language and give her two

18  copies, so she could mark up one.  If she's ready to sign it

19  as is, so be it.

20        Otherwise, Ms. Burton, it's incumbent on you to

21  call Ms. Kantor.  If you don't have a phone number where she

22  could call you back, lawyers do have more than a couple of

23  cases at a time.  So if you can't get through to her on the

24  moment that you call her to discuss something, you should

25  leave a message and say -- you know, ask the secretary when

1   is a good time to call back, because if she can't call you,

2   you're going to have to try her back at an hour.

3          So you should let your -- the person who's your

4   assistant know that she doesn't have a phone and if you're

5   in a meeting, to give a different hour that she could call,

6   okay?

7          MS. KANTOR:  Certainly.  Once Ms. Burton and I do

8   come to agreement as to the contents of the confidentiality

9   order, I would like to submit it to the Court --

10          THE COURT:  That's fine.  Once both parties have,

11   signed, I can so order that, and that could be entered as an

12   ECF document.

13          Most documents are filed electronically.  Because

14   a pro se litigant won't have access to the electronic

15   filing, once you both agree on it, she can file it, scan it

16   in electronically for me to so order, and you would be able

17   to see that the record has been received by coming into the

18   Court and looking on those ports that are downstairs, the

19   computer terminals.

20          MS. BURTON:  Yes.

21          THE COURT:  Okay.

22          MS. KANTOR:  The last question, your Honor, is out

23   of an excess of caution.  Ms. Burton indicates she will be

24   going -- you know, she's on vacation for a month, but I did

25   notice obviously that your Honor expects us to work on the

1   confidentiality agreement and have that done in a couple of

2   weeks.  So I'm assuming but just want to make sure that the

3   next month is not a discovery-free month or that --

4            THE COURT:  No, no, no.  You should get started

5   now.

6            Ms. Burton, you should get this worked out, the

7   confidentiality agreement and the releases for any medical

8   or mental health provision before you leave, because that

9   usually holds up discovery, because doctors' offices

10  certainly don't jump when you give them a release.

11           And the releases are HIPAA releases.  You should

12  provide them to Ms. Burton so she could look over them.

13  They say that you're releasing to defendant.  Any records

14  that they get, Ms. Burton, they will make a copy for your

15  records.  Just like these records should all have numbers

16  stamped on them -- do you see at the bottom corner that

17  there are numbers stamped?

18           MS. BURTON:  Yes, your Honor.

19           THE COURT:  What I will say to you, Ms. Burton, is

20  keep those documents, one set of them in that order.  If you

21  want to take them apart and look at them in different piles,

22  that's fine.  They're yours to do what you will with them.

23  But it's a lawyer's trick to keep one as it was given to

24  you, because if you start taking them apart, then you don't

25  know where this number went to, and they're going to say

1   they gave them to you in sequential order, okay?  So if they

2   were to get your medical records, they would produce

3   numbered copies of those records to you.

4            MS. BURTON:  Your Honor, I just need to let you

5   know that I have an uncontrollable situation at my residence

6   of home invasion, which is involving theft of the documents.

7            THE COURT:  Well, I can't deal with all the

8   problems, Ms. Burton.  I'm just trying to set up as best I

9   can so you know what to expect during the litigation, okay?

10           MS. BURTON:  Thank you.

11           THE COURT:  Okay.  So, Ms. Kantor and Ms. Burton,

12  you're expected to meet.  You can do it today if you have

13  anything to talk about, but you are expected to get this

14  confidentiality order exchanged, signed, submitted to the

15  Court.  The Court is setting November 15th as the deadline

16  for all discovery and 12/5/11 for any request to Judge

17  Townes regarding a dispositive motion.

18           With that, this matter is adjourned.  Thank you

19  very much.

20           MS. KANTOR:  Thank you, your Honor.

21           MS. BURTON:  Thank you, your Honor.

22                     * * * * * * * *

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18     I certify that the foregoing is a correct transcript

19  from the electronic sound recording of the proceedings in

20  the above-entitled matter.

21

22

23

24

25  ELIZABETH BARRON                    July 19, 2011